WO          IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


| | |
|---|---|
| In re: ) | |
| ) | |
| JACK D. ROSE and VANESSA PALMA ) | |
| ROSE, ) | |
| ) | |
| Debtors. ) | |
| _____ ) No. 2:16-cv-3868-HRH | |
| ) | |
| JACK D. ROSE and VANESSA PALMA ) | |
| ROSE, ) | |
| ) | |
| Appellants, ) | |
| ) Bk. No. 2:11-bk-13156-GBN | |
| vs. ) Adv. Case No. 2:12-ap-00996-GBN | |
| ) BAP Case No. AZ-16-1327 | |
| DAVID M. REAVES, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |


<u>O R D E R</u>

Appellants/defendants Jack D. Rose and Vanessa Palma Rose appeal[1] the bankruptcy

court's order and judgment denying a discharge under sections 727(a)(2)(A) and

727(a)(4)(A) of the Bankruptcy Code.  Oral argument was not requested and is not deemed

necessary.

---

[1]This court has jurisdiction of this appeal under 28 U.S.C. § 158(a)(1), (b), and (c)(1).

Background[2]

Jack Rose was a real estate developer whose business was adversely affected by the real estate market crash in 2007 and 2008. Mr. Rose is a graduate of Yale University and Harvard Law School. Vanessa Rose is a registered nurse and her role in Mr. Rose's business was to sign papers, such as personal guarantees, upon request.

In approximately February of 2010, Mubeen Aliniazee formed the entity Highpoint Management Solutions LLC ("Highpoint"). Aliniazee was a former employee as well as a personal friend of Mr. Rose.

In approximately May 2010, the Roses began using a bank account maintained in Highpoint's name. The Roses deposited their own funds into the Highpoint account and Highpoint created a ledger to track these deposits  The Highpoint ledger also tracked any payments made out of the Highpoint account on the Roses' behalf. The Roses deposited their state income tax refund into the Highpoint account in December 2010 and their federal income tax refund in February 2011. These two deposits into the Highpoint account totaled approximately $300,000. Mr. Rose and Highpoint entered into written agreements regarding the deposit of the tax refunds into the Highpoint account, one for each of the tax refund deposits. In addition to the two tax refund deposits, the Roses made eleven other deposits

[2]Unless otherwise noted, these background facts are taken from the bankruptcy court's findings of fact and conclusions of law. Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

into the Highpoint account between May 27, 2010 and May 5, 2011, totaling $411,285.32 in all.

Highpoint issued checks from the account at the direction of Mr. Rose. In addition, Mr. Rose had a debit card for this account. The money deposited in the Highpoint account by the Roses was primarily used to pay lawyers, including Mr. Rose's defense attorney[3] and the Roses' bankruptcy counsel. In addition, at least one creditor (Irene Beard/Touch Stone) was paid out of the Highpoint account as were the Roses' accountants. The Highpoint account was also used to pay personal expenses of the Roses. Mr. Rose testified that he used the Highpoint account because he had no other bank account and he needed to pay his attorneys. Mr. Rose testified that he had no intent to conceal the funds in the Highpoint account and that he had no intent to defraud his other creditors by using the Highpoint account to pay his attorneys.

In June 2010, Meridian Bank NA ("Meridian") obtained an $8 million judgment against the Roses. Meridian pursued collection by garnishing the Roses' bank accounts. In December 2010, Mr. Rose closed his bank account at Washington Federal after it was garnished by Meridian. Meridian also served a writ of garnishment on Highpoint in December 2010. This garnishment was limited to funds in the account that constituted

---

[3]Mr. Rose was under a criminal indictment for allegedly improperly using investor funds. The charges against Mr. Rose were eventually dropped but not before he had spent more than $500,000 on attorney's fees. Defendants' Post-Trial Memorandum of Law at 10, Tab 2, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 8-1.

earnings of the Roses and was not a general garnishment of assets. Highpoint denied paying earnings to Mr. Rose.[4] As part of its collection efforts, Meridian also served document subpoenas on the Roses and sought, among other documents, "[s]tatements on all checking and savings accounts maintained by or on behalf of the named Defendant/Judgment Debtor in any depository, wherever located...."[5] The Roses provided no information about the Highpoint account in response to this request.

On May 6, 2011, the Roses filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. As part of their case, the Roses filed schedules, a statement of financial affairs ("SOFA"), an amended SOFA, amended Schedules A, B, and C, amended Schedules B and F, and a final amended SOFA. The Roses each read these various schedules, statements, and amendments before signing them. The Roses signed all of these filings under oath, knowing that their creditors would rely on them and after being warned of possible sanctions for making a false statement.

The Roses' Schedules listed thirty general unsecured creditors with claims totaling more than $35 million.[6] The SOFAs listed more than fifty entities in which the Roses' had

---

[4]Mr. Rose did, however, receive non-employee compensation from Highpoint and another Aliniazee company in 2010 of slightly less than $90,000.

[5]Findings of Fact, Conclusions of Law and Order at 4, ¶ 7, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9 (emphasis omitted).

[6]Defendants' Post-Trial Memorandum of Law at 6, Tab 2, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 8-1.

an interest, twenty-one lawsuits involving the Roses' in some capacity, and five foreclosure actions against real estate owned by the Roses.[7]

The Roses' initial SOFA did not list the funds deposited into the Highpoint account or otherwise mention the Highpoint account. The Highpoint account was also not listed on the Roses' initial Schedule B. Mr. Rose believed that at the time the Roses filed their petition, there were no Rose funds left in the Highpoint account, but there was in fact $1,325.41 in the account. The Roses' September 2013 amendment of Schedule B was the first time the Highpoint account was listed.

On June 7, 2011, the United States Trustee conducted a meeting of creditors. The Highpoint account was not mentioned or discussed during the June 7 meeting. This meeting was relatively short because of Mrs. Rose's work schedule and the Trustee's availability.[8] The meeting was continued to June 30, 2011. At the June 30, 2011 meeting, Mr. Rose was questioned extensively about the Highpoint account. After the creditors' meeting, Highpoint produced a copy of the Highpoint ledger and bank statements from the Highpoint account.

On November 16, 2011, plaintiff David Reaves was appointed as Chapter 11 trustee. Copies of the Highpoint ledger and Highpoint account bank statements were forwarded to him.

---

[7]Id.

[8]Id. at 7.

On January 9, 2012, the Roses' bankruptcy case was converted to a Chapter 7 liquidation case. Reaves was appointed the Chapter 7 trustee.

On May 23, 2012, Reaves commenced an adversary proceeding seeking to deny the Roses a Chapter 7 discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(4)(A), and 727(a)(7). After four days of trial testimony and post-trial briefing and argument, on September 27, 2016, the bankruptcy court entered its Findings of Fact, Conclusions of Law and Order. The bankruptcy court concluded that Mr. Rose had violated sections 727(a)(2)(A) and 727(a)(4)(A), but that Mrs. Rose had not. The bankruptcy court also concluded that there had been no violation of section 727(a)(7) by either of the Roses. The bankruptcy court thus ordered that Mr. Rose and the marital community of Jack D. Rose and Vanessa Palma Rose would not be granted a discharge in their bankruptcy case. Judgment to that effect was entered on September 29, 2016.

On November 7, 2016, the Roses filed an appeal of the bankruptcy court's order and judgment denying a discharge under sections 727(a)(2)(A) and 727(a)(4)(A).

## Standard of Review

> [T]he standard of review for an objection to discharge is: "(1) the court's determination of the historical facts are reviewed for clear error; (2) the selection of the applicable legal rules under § 727 is reviewed de novo; and (3) the application of the facts to those rules requiring the exercise of judgments about values animating the rules is reviewed de novo."

Weddell v. Landis, 551 B.R. 74, 79-80 (D. Nev. 2016) (quoting In re Searles, 317 B.R. 368, 373 (9th Cir. BAP 2004)). "'Because discharge is a matter generally left to the sound

discretion of the bankruptcy judge, [courts] disturb this determination only if [they] find a gross abuse of discretion.'" Id. at 80 (quoting In re Cox, 41 F.3d 1294, 1296 (9th Cir. 1994)). "Accordingly, district courts 'defer to the bankruptcy court's conclusions ... unless its factual findings are clearly erroneous or it applies the incorrect legal standard.'" Id. "A court's factual determination is clearly erroneous if it is illogical, implausible, or without support in the record." In re Retz, 606 F.3d 1189, 1196 (9th Cir. 2010).

> When factual findings are based on determinations regarding the credibility of witnesses, [the court] give[s] great deference to the bankruptcy court's findings, because the bankruptcy court, as the trier of fact, had the opportunity to note "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."

Id. (quoting Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 575 (1985)).

## Discussion

"'[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" In re Sicroff, 401 F.3d 1101, 1104 (9th Cir. 2005) (quoting Grogan v. Garner, 498 U.S. 279, 286 (1991)). "It is only the 'honest but unfortunate' debtor, however, who is entitled to an entirely unencumbered fresh start." Id. (quoting Grogan, 498 U.S. at 286). A debtor may forfeit his discharge if, in the year before filing, he, with an intent to hinder, delay or defraud, transfers or conceals property or if he knowingly and fraudulently makes a false oath in his schedules or SOFA.

The first issue presented in this appeal is whether the bankruptcy court erred in denying Mr. Rose's discharge under section 727(a)(2)(A). Section 727(a)(2)(A) provides that a bankruptcy discharge can be denied if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed ... property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A). "A party seeking denial of discharge under § 727(a)(2) must prove two things: '(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property.'" In re Retz, 606 F.3d at 1200 (quoting Hughes v. Lawson, 122 F.3d 1237, 1240 (9th Cir. 1997)). "Section 727's denial of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge." In re Adeeb, 787 F.2d 1339, 1342 (9th Cir. 1986).

The bankruptcy court concluded that "[t]his case involves disposition through deposit into a concealed bank account"[9] and "that Mr. Rose intentionally concealed his use and interest in the Highpoint account both before and after filing bankruptcy to hinder and delay

---

[9]Findings of Fact, Conclusions of Law and Order at 42, n.14, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

his creditors, principally Meridian."[10]  The Roses argue that the bankruptcy court erred as to both of these conclusions.

First, the Roses argue that the bankruptcy court erred in concluding that there had been a disposition of property for purposes of section 727(a)(2)(A) because there was neither a transfer nor a concealment here.  The Roses argue that there could not have been a transfer of property because Mr. Rose maintained ownership of the funds deposited into the Highpoint account.  The Roses rely on <u>Adeeb</u>, 787 F.2d 1339, in support of this argument.  There, the Ninth Circuit held that "'transferred' as used in section 727(a)(2)(A) [means] 'transferred and remained transferred[.]'"  <u>Id.</u> at 1344.  The court explained that

> [t]he language of section 727(a)(2)(A) demonstrates that Congress intended to deny discharge to debtors who take actions designed to keep their assets from their creditors either by hiding the assets until after they obtain their discharge in bankruptcy or by destroying them.  The only type of transfer that has the effect of keeping assets from creditors is a transfer in which the property remains transferred at the time the bankruptcy petition is filed.

<u>Id.</u> at 1344-45 (internal citation omitted).  The Roses argue that the bankruptcy court departed from the reasoning of <u>Adeeb</u> and effectively concluded that disposition of property can occur with any transfer of funds by the debtor, regardless of whether the funds remained the property of the debtor.  Here, the Roses insist there could not have been a transfer when Mr. Rose deposited funds into the Highpoint account because Mr. Rose maintained control of the

---

[10]<u>Id.</u> at 43, ¶ 6.

deposited funds at all times and the funds were not beyond the reach of their creditors, as evidenced by the fact that at least one of their creditors was paid with funds from the Highpoint account.

The Roses' reliance on Adeeb is misplaced. There, Adeeb, who was facing financial difficulties, "transferred title to several parcels of real property to friends and associates for no consideration" on the advice of his attorney, who was not a bankruptcy attorney. Adeeb, 787 F.2d at 1341. "As his financial condition continued to worsen, Adeeb sought advice from Mayer, a bankruptcy attorney. Mayer advised Adeeb to reverse the transfers and to disclose them to his creditors. Adeeb immediately began to reverse the transfers." Id. Adeeb then called a meeting of his creditors at which he disclosed the transfers and advised that he was in the process of reversing the transfers. Id. at 1341-42. After the meeting, some of Adeeb's creditors filed an involuntary bankruptcy petition against him. Id. at 1342. "Adeeb decided not to contest that petition and filed a voluntary bankruptcy petition" five days later. Id. Three of his creditors sought to block his discharge pursuant to section 727(a)(2)(A). Id. The bankruptcy court held that section 727(a)(2)(A) barred Adeeb's discharge, but the Ninth Circuit reversed. Id. at 1342, 1346. The Ninth Circuit held "that a debtor who transfers property within one year of bankruptcy with the intent penalized by section 727(a)(2)(A) may not be denied discharge of his debts if he reveals the transfers to his creditors, recovers substantially all of the property before he files his bankruptcy petition, and is otherwise qualified for a discharge." Id. at 1345. The Ninth Circuit "emphasize[d]

that the debtor must be making a good faith effort to recover the property prior to the filing of the involuntary petition, and he must actually recover the property within a reasonable time after the filing of the involuntary petition." Id. at 1346.

Here, in contrast, Mr. Rose made no effort to recover any of the funds that he had transferred to the Highpoint account, primarily because those funds had been transferred, as that term is defined for purposes of section 727(a)(2)(A), to Mr. Rose's lawyers, accountants, and other creditors. The funds that were deposited into the Highpoint account remained transferred at the time of the petition because they were no longer in Mr. Rose's control (except for approximately $1300). The fact that the Roses had not deposited the funds in the Highpoint account so that they could access them after their bankruptcy case was concluded does not save the Roses. By depositing the funds in the Highpoint account, the Roses kept assets from one of their major creditors, Meridian. The Roses' argument that there was no property to recover from the Highpoint account because the property had never been "transferred" as that term is used in section 727(a)(2)(A) misses the mark. There was no property to recover not because the property that the Roses had put in the Highpoint account had never been transferred, but because the Roses had transferred the property in the Highpoint account to their lawyers, accountants, and others.

In sum, the bankruptcy court did not err in finding that the use of the Highpoint account by Mr. Rose involved a disposition by transfer. Mr. Rose first deposited (transferred) funds held in the Roses' name to the Highpoint account. Those funds were then

paid out (a second transfer) to others such that when the Roses filed their petition, virtually all of the funds had been paid out of the Highpoint account. These actions by Mr. Rose constituted a disposition of property.

The Roses argue that if depositing funds into a checking account and using those funds is considered a "transfer" for purposes of section 727(a)(2)(A), a debtor, in the year prior to filing his petition, would not be able to pay ordinary expenses without running afoul of section 727(a)(2)(A). Not so. The intent element of a section 727(a)(2)(A) violation would still have to be met. If the use of a checking account by a debtor was not for the purpose of hindering, delaying, or defrauding a creditor, the debtor's deposit of funds into the account and use of the account would not result in a denial of discharge under section 727(a)(2)(A).

The bankruptcy court alternatively found that there had been a disposition of property through concealment. The Roses, however, argue that the bankruptcy court erred in concluding that there had been a concealment because the Highpoint account was never concealed. The Roses contend that the basis for the bankruptcy court's conclusion that the Highpoint account was concealed was that the account should have been disclosed to Meridian. But, the Roses argue that the uncontroverted evidence shows that Meridian's flawed collection attempts did not require the disclosure of the Highpoint account because the garnishment writ was directed only to whether Mr. Rose had "earnings" from

Highpoint.[11]  As the bankruptcy court found, "[t]he Meridian garnishment of the Highpoint

bank account was limited to funds in the account that constituted earnings of the Roses and

was not a general garnishment of assets.  Meridian was pursuing information that Highpoint

was providing earnings to Jack Rose."[12]  The Roses argue that there is no authority that

supports the contention that a debtor has to volunteer information to creditors, yet they argue

that is what the bankruptcy court found here, that Mr. Rose should have told Meridian about

the Highpoint account pre-petition even though Meridian's writ of garnishment was limited

to Mr. Rose's earnings.  The Roses also argue that the evidence shows that they disclosed the

Highpoint account both pre-petition and post-petition.  For example, Irene Beard, the

manager of one of the Roses' creditors, testified that she received Highpoint checks from the

Roses as payment.[13]  And, Mr. Rose was questioned extensively about the Highpoint account

at the June 30, 2011 creditors' meeting.  In light of this evidence, the Roses argue that the

bankruptcy court should not have found that they concealed the Highpoint account because

a "'debtor who fully discloses his property transactions at the first meeting of creditors is not

fraudulently concealing property from his creditors.'"  Adeeb, 787 F.2d at 1345 (quoting In

re Waddle, 29 B.R. 100, 103 (Bankr. W.D. Ky. 1983)).  As even plaintiff testified, when he

---

[11]Trial Transcript (Sept. 22, 2015) at 20-21, Tab 3, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 8-1.

[12]Findings of Fact, Conclusions of Law and Order at 5, ¶ 9, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

[13]Id. at 7, ¶ 13.

reviewed the transcript of the June 30, 2011 creditors meeting, it was clear that Mr. Rose had disclosed that the tax refunds had been deposited into the Highpoint account pre-petition.[14]

The bankruptcy court did not commit clear error in finding that Mr. Rose concealed the Highpoint account. In the year before the Roses filed bankruptcy, Meridian served a subpoena on Mr. Rose seeking information about any checking accounts maintained by or on behalf of Mr. Rose. In response, it is undisputed that the Roses did not provide any information about the Highpoint account. The Roses' failure to respond to Meridian's subpoena was sufficient evidence to support a conclusion that Mr. Rose was concealing the Highpoint account pre-petition.

The Roses next argue that the bankruptcy court erred as a matter of law in concluding that Mr. Rose's use of the Highpoint account was intended to hinder and delay his creditors, in particular Meridian. "[D]ischarge of debts may be denied under section 727(a)(2)(A) only upon a finding of actual intent to hinder, delay, or defraud creditors." Adeeb, 787 F.2d at 1342. "[I]ntent 'may be established by circumstantial evidence, or by inferences drawn from a course of conduct.'" Id. at 1343 (quoting In re Devers, 759 F.2d 751, 753-54 (9th Cir. 1985)). "Because the language of the statute is in the disjunctive it is sufficient if the debtor's intent is to hinder or delay a creditor." In re Retz, 606 F.3d at 1200. "A debtor's intent need not be fraudulent to meet the requirements of § 727(a)(2)." Id.

---

[14]Trial Transcript (Sept. 23, 2015) at 8:19-25, Tab 4, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 8-1.

The Roses argue that the bankruptcy court erred as a matter of law in concluding that Mr. Rose's use of the Highpoint account was intended to hinder and delay his creditors because the bankruptcy court's reliance on In re Beauchamp, 236 B.R. 727, 731-32 (9th Cir. BAP 1999), was misplaced. There, Beauchamp had his wife open a checking account "for the purpose of depositing checks payable to [him]. The account was in her name alone, and she was the sole signatory on the account, but the two understood that the money was his." Id. at 729. At the time Beauchamp filed for Chapter 13 relief, there was $10,935.20 in the account. Id. Beauchamp did not "disclose the account on his schedules." Id. After one of his creditors, to whom Beauchamp owed $200,000, gave Beauchamp notice that he intended to seek Rule 2004 examinations of both Beauchamp and his wife, "Beauchamp amended his schedules B, C, D and F to include, among other things, the account." Id. The bankruptcy "court determined that Beauchamp had transferred approximately $10,000 with intent to hinder or delay creditors," and denied his discharge. Id. On appeal, Beauchamp

> argue[d] that, because he disclosed his clandestine account before the first meeting of creditors and amended his schedules accordingly, the bankruptcy court erred in barring his discharge. In his view, Adeeb directs courts in this circuit to clear repentant debtors, setting the deadline for repentance no earlier than the first meeting of creditors.

Id. at 732. The appellate court rejected this argument because Adeeb does not stand for the proposition "that disclosure of secreted assets at or before the § 341 meeting precludes finding intent to hinder, delay or defraud[.]" Id. at 734. Rather, as the Adeeb court held, the debtor must be "'making a good faith effort to recover the property transferred at the time

an involuntary bankruptcy petition is filed....'" Id. at 733 (quoting Adeeb, 787 F.2d at 1346). Because Beauchamp had only disclosed the secret account due to the impending 2004 examinations, the appellate court found that the bankruptcy court had not erred in finding that the debtor's disclosure was not motivated by good faith. Id. at 734.

The Roses argue that there are significant differences between this case and Beauchamp. First, unlike the debtor there, they argue that Mr. Rose did not have Aliniazee create the Highpoint account for the sole purpose of concealing property to be used after the petition date. Rather, the Highpoint account was created by Aliniazee for the purpose of managing Aliniazee's own business. The bankruptcy court dismissed this distinction as "[n]o matter"[15] but the Roses argue that this distinction does matter because the fact that the account was not expressly created for the purpose of concealing funds negates a finding of subjective intent to hinder or delay. The Roses also make much of the fact that at the time the tax funds were received, Mr. Rose had no other account into which he could have deposited the funds.

The fact that the Highpoint account was not created for the sole purpose of receiving the Roses' funds is a distinction without a difference from Beauchamp. As for the Roses' contention that Mr. Rose had no other account into which he could have deposited the tax refunds, this contention is simply wrong. The Roses' bankruptcy schedules listed five bank

_____

[15]Findings of Fact, Conclusions of Law and Order at 44, ¶ 8, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

accounts, any one of which could have been used to deposit the tax refunds. Mr. Rose testified that he did not use any of these accounts because they were in Mrs. Rose's name but the bankruptcy court found this testimony incredible,[16] a finding to which this court gives deference. Mr. Rose also could have opened an account into which he could have deposited the tax refunds, but he expressly chose not to do that in order to hinder Meridian from collecting on its judgment. Mr. Rose testified that if he had put the tax refunds into an account in his name, rather than in the Highpoint account, those funds would have been garnished.[17] Plainly, Mr. Rose used the Highpoint account to shield (hide) his funds from Meridian, which had a judgment against the Roses at the time Mr. Rose elected to deposit the tax refunds into the Highpoint account.

The Roses next argue that the bankruptcy court's conclusion that Mr. Rose had the actual, subjective intent to hinder or delay is erroneous as a matter of law because some of the funds were used to pay creditors. The Roses contend that section 547 of the Bankruptcy Code addresses the payment to one creditor over another prior to a bankruptcy filing but nothing in section 547 provides a basis for a denial of discharge.

The fact that some of the Highpoint funds were used to pay one creditor does not save the Roses. "As the Adeeb decision makes clear, withholding funds from one creditor to pay

---

[16]Id. at 37, ¶ 73.

[17]Trial Transcript (Sept. 22, 2015) at 163:4-22, Tab A, Excerpts of Record in Support of Trustee's Response Brief, Docket No. 15.

another, does not absolve the debtor of the violation of § 727(a)(2)(A) that he has committed." In re Schafer, 294 B.R. 126, 131 (N.D. Cal. 2003).

Plaintiff aptly argues that this case is similar to In re Schafer. There, Schafer had defaulted in making payments to Transamerica Commercial Finance Corporation and Transamerica had garnished Schafer's bank account. Id. at 128. Schafer then opened a new account at Mechanics Bank and deposited $75,000 in the account. Id. "Schafer stated that he opened the new account at Mechanics Bank because Transamerica previously attached his old account." Id. "Schafer stated that he used the money in the new account to pay his creditors on a pro rata basis" and "that he held money in the form of cashier's checks to keep it from being attached by Transamerica." Id. The district court held that the bankruptcy court had not erred in finding a violation of section 727(a)(2) because the opening of a bank account and placing funds in that account was a "transfer" and that Shafer's intent in opening the new bank account was to hinder or delay Transamerica. Id. at 130-32. Similarly here, the bankruptcy court did not err in finding that Mr. Rose's use of the Highpoint account, instead of an account in his or Mrs. Rose's name, was done to hinder or delay Meridian.

Next, the Roses argue that the "badges of fraud" do not support a finding of actual, subjective intent.

> In examining the circumstances of a transfer under § 727(a)(2), certain "badges of fraud" may support a finding of fraudulent intent.

>> "These factors, not all of which need be present, include (1) a close relationship between the

transferor and the transferee; (2) that the transfer
was in anticipation of a pending suit; (3) that the
transferor Debtor was insolvent or in poor finan-
cial condition at the time; (4) that all or substan-
tially all of the Debtor's property was transferred;
(5) that the transfer so completely depleted the
Debtor's assets that the creditor has been hindered
or delayed in recovering any part of the judgment;
and (6) that the Debtor received inadequate
consideration for the transfer."

In re Retz, 606 F.3d at 1200 (quoting Emmett Valley Assocs. v. Woodfield, 978 F.2d 516,

518 (9th Cir. 1992)).

    Although the section 727(a)(2)(A) violation did not involve "fraudulent intent," the

bankruptcy court relied on the "badges of fraud" in determining whether Mr. Rose had the

actual, subjective intent to hinder or delay his creditors.  The bankruptcy court found that

many of the "badges of fraud" were present here,

        including the close relationship between Mr. Rose and Mr.
        Aliniazee, use of the concealed account in the face of entered
        judgments and pending collection activities, occurring when the
        Debtors were in poor financial condition and that virtually all of
        an extremely large set of tax refunds were concealed, frustrating
        Meridian's ongoing discovery and collection activities.[18]

    The Roses argue that this "badges of fraud" finding was clear error.  As for

Aliniazee's close relationship with Mr. Rose, the Roses contend that the bankruptcy court

found that Aliniazee was unwilling to share information about the Highpoint account with

_____

    [18]Findings of Fact, Conclusions of Law and Order at 42, ¶ 5, Tab 7, Excerpts of
Record in Support of Appellants' Opening Brief, Docket No. 9.

creditors, especially with Irene Beard and Meridian.[19]  But, the Roses argue that Aliniazee is not a defendant and no evidence demonstrated why he would have been obligated to provide information beyond what he was asked, and as the bankruptcy court found, at the garnishment hearing, "Aliniazee answered all questions asked."[20]  Moreover, the Roses point out that Aliniazee testified that he was not willing to commit perjury for Mr. Rose.[21]  As for the amount of the tax refunds, the Roses argue that this amount, approximately $316,000, was negligible in relation to their debt of over $35 million.

The bankruptcy court did not err in relying on the badges of fraud to determine whether Mr. Rose had the requisite intent.  "Courts may use badges of fraud not only to show the intent to defraud, but also to show the intent to hinder or the intent to delay."  In re Stanton, 457 B.R. 80, 93 (Bankr. D. Nev. 2011).  The bankruptcy court also did not err in finding that many of the badges of fraud were present here.  Based on the evidence, this finding was not illogical or implausible.

The Roses next argue that the bankruptcy court committed clear error in finding that the concealment of the Highpoint account was evidence of fraud.  The Roses argue that this was clear error because, as discussed above, they contend that the Highpoint account was not concealed but rather disclosed to creditors both pre-petition and post-petition.

---

[19]Id. at 8, ¶ 14; 10, ¶ 17.

[20]Id. at 23, ¶ 42.

[21]Trial Transcript (Sept. 23, 2015) at 140:5-8, Tab 4, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

To the extent that the bankruptcy court's conclusion as to Mr. Rose's actual, subjective intent was based on the fact that the Highpoint account was a concealed account, the bankruptcy court did not err. As discussed above, there was sufficient evidence to support a conclusion that the Highpoint account was concealed pre-petition.

The Roses next argue that the bankruptcy court committed clear error in finding that Mr. Rose's choice of defense counsel was evidence of his actual, subjective intent to hinder or delay. The bankruptcy court concluded that

> Mr. Rose was forced to reconcile two powerful forces: his intent to expend hundreds of thousands of dollars for a top litigator in his criminal defense, using a large part of the expected large refunds, with the collection pressure exerted by Meridian to discover collectable assets. While a difficult predicament, he chose an impermissible solution: pre and post-petition concealment of funds held in someone else's bank account.[22]

In a footnote, the bankruptcy court noted that "[w]hile the Roses wish to present this challenge as a 'Hobson's choice' between prison or paying creditors, this is manifestly not the case" and suggested that Mr. Rose could have relied on appointed counsel rather than spending $500,000 on retained counsel.[23] The Roses argue, however, that Mr. Rose's decision to retain defense counsel, rather than rely on a public defender, is not evidence of actual, subjective intent to hinder or delay. The Roses contend that when faced with the

---

[22]Findings of Fact, Conclusions of Law and Order at 44-45, ¶ 8, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

[23]Id. at n.16.

prospect of going to jail, one does not bargain hunt.  The Roses insist that the bankruptcy

court should not have inferred fraudulent intent from Mr. Rose's actual intent, which was to

pay his attorney to defend against a false criminal indictment.  But if the bankruptcy court

erred in finding that Mr. Rose should not have relied on retained criminal defense counsel,

"this error [would be] harmless as the weight of the other factual findings support the

bankruptcy court's conclusion."  <u>In re Song</u>, Case No. CC–10–1342–SaPaKi, 2011 WL

6934462, at *13 (9th Cir. BAP Sept. 30, 2011).

The Roses next argue that the bankruptcy court erred in concluding that they had

"failed to rebut" the inference of fraudulent behavior that the trustee had established.[24]  The

Roses argue that the rebuttal facts include that they could not have anticipated the real estate

market crash or that Mr. Rose would be indicted, that they did not use the funds in the

Highpoint account for extravagant expenses, that they originally filed Chapter 11 with the

intent to repay their creditors, and that Mr. Rose did not have a bank account at the time the

tax refunds were received.

While some of the facts that the Roses point to do suggest that there were events

beyond their control that contributed to their financial woes, the bankruptcy court's finding

that these facts did not rebut the evidence of intent was not illogical or implausible.  Mr.

Rose had other options than using the Highpoint account but the fact remains that he chose

---

[24]<u>Id.</u> at 45, ¶ 8.

to use that account to avoid the Meridian garnishment. None of the facts the Roses cite to rebut that fact.

Finally, as to Mr. Rose's actual, subjective intent, the Roses argue that the bankruptcy erred in concluding that Mr. Rose had a fraudulent intent when the evidence confirms his actual intent. The Roses contend that Mr. Rose testified that he intended to use the funds in the Highpoint account to pay his attorneys, accountants, and creditors. The evidence shows that this is exactly how the Highpoint funds were used. The Roses insist that where the actual conduct of the debtor demonstrates the use of funds for legitimate business purposes and it matches precisely the debtor's stated intent, it is improper for the bankruptcy court to infer fraudulent intent. "[W]here 'there was no evidence that the money was not reasonably used or that it was squandered[,] [i]ndicia of fraud are totally lacking.'" In re Beauchamp, 236 B.R. at 731 (quoting Gillickson v. Brown, 108 F.3d 1290, 1293 (10th Cir. 1997)).

As plaintiff repeatedly points out, it is irrelevant whether Mr. Rose had a fraudulent intent or not because the bankruptcy court found that Mr. Rose intended to hinder or delay Meridian and this finding is sufficient for there to be a section 727(a)(2) violation. The bankruptcy court was not required to also find that Mr. Rose had fraudulent intent. That said, Mr. Rose may have intended, and actually, used the Highpoint account to primarily pay his attorneys, but he did so knowing that Meridian was trying to collect its $8 million judgment. The evidence plainly establishes that Mr. Rose used the Highpoint account so that he could use the Roses' tax refunds as he wished, rather than having those funds garnished by

Meridian. The bankruptcy court did not err in concluding that Mr. Rose had the actual, subjective intent to hinder or delay Meridian.

The second issue raised in this appeal is whether the bankruptcy court erred in denying Mr. Rose's discharge under section 727(a)(4)(A). Section 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case[,] made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A). "'A false statement or an omission in the debtor's bankruptcy schedules or statement of financial affairs can constitute a false oath.'" In re Retz, 606 F.3d at 1196 (quoting In re Khalil, 379 B.R. 163, 172 (9th Cir. BAP 2007)). "To prevail on [a § 727(a)(4)(A)] claim, a plaintiff must show, by a preponderance of the evidence, that: '(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently.'" Id. at 1197 (quoting Roberts v. Erhard, 331 B.R. 876, 882 (9th Cir. BAP 2005)). The bankruptcy court concluded that there had been a section 727(a)(4)(A) violation in connection with the Roses' original SOFA,[25] but that there had been no section 727(a)(4)(A) violation in connection with the Roses' original Schedule B.[26]

---

[25]Findings of Fact, Conclusions of Law and Order at 47, ¶ 10, Tab 7, Excerpts of the Record in Support of Appellants' Opening Brief, Docket No. 9.

[26]Id. at 46, ¶ 10. For this reason, plaintiff's arguments as to Schedule B are irrelevant.

The bankruptcy court found that Mr. Rose made a false oath by either not listing the tax refunds that were deposited into the Highpoint account as a transfer or by not listing the Highpoint account as a closed account in the original SOFA.[27]  As even the Roses seem to acknowledge, if the Highpoint account were a "closed account", it should have been listed on their original SOFA.  The question here is whether the Highpoint account was in fact a "closed account" that should have been listed on the original SOFA.

The Roses argue that the bankruptcy court erred in concluding that the Highpoint account was a closed account because the Highpoint account remained open and was not closed on the petition date.  The bankruptcy court noted that it

> presume[d] [the Highpoint] account remained open for its more conventional use as a Highpoint business account.  The relevant use however is its use by debtors.  Once it completed its role as a concealed depository for funding of attorneys and other favored creditors, Mr. Rose intended the transfer out of all remaining Rose funds, thus functionally closing it as an account "... for the benefit of the debtor...."[[28]]

The Roses insist however that the Highpoint account was not a closed account and thus it was error for the bankruptcy court to conclude that it should have been listed as such an account on the original SOFA.

The bankruptcy court did not commit clear error in finding that there had been a false oath.  For the Roses' purposes, the Highpoint account was believed to have been exhausted

---

[27]Findings of Fact, Conclusions of Law and Order at 46-47, ¶ 10, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

[28]Id. at 46, n.17.

and was, in effect, a closed account. Although the Highpoint account had $1,325.41 of the Roses' funds in it at the time of the petition, Mr. Rose had instructed that the Highpoint account be drained prior to the Roses filing their petition. As far as the Roses were concerned, the Highpoint account was a closed account at the time of their petition. The Highpoint account should have been listed on their original SOFA.

The Roses next argue that the bankruptcy court erred as to materiality. "'A fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property.'" In re Retz, 606 F.3d at 1198 (quoting In re Khalil, 379 B.R. at 173). "An omission or misstatement that 'detrimentally affects administration of the estate' is material." Id. (quoting In re Wills, 243 B.R. 58, 63 (9th Cir. BAP 1999)).

The Roses contend that the bankruptcy court made no finding that the omission of the Highpoint account on the original SOFA was material. But, plaintiff argues that the bankruptcy court did make a materiality finding when it concluded that "Mr. Rose's deliberate decisions frustrated the fundamental purpose" of section 727(a)(2), which "is to insure that the trustee and creditors have accurate information without having to conduct costly investigations."[29]

---

[29]Findings of Fact, Conclusions of Law and Order at 42, ¶ 4, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

Assuming that the bankruptcy court's above statement was a finding of materiality, that finding was not supported by the record and was clearly wrong. As plaintiff concedes, everyone knew about the Highpoint account by June 30, 2011, six weeks after the Roses' petition was filed. There is no evidence that the failure to list the Highpoint account on the original SOFA detrimentally affected the administration of the bankruptcy estate.

The Roses next argue that the bankruptcy court erred in finding that "the decision to exclude [the Highpoint account] from the original SOFA was a knowing, fraudulent false oath by a chief strategist for a bankruptcy and workout firm, who at the time of filing his own bankruptcy, believed he could read bankruptcy schedules better than all but a few debtors."[30] "'A debtor acts knowingly if he or she acts deliberately and consciously.'" In re Retz, 606 F.3d at 1198 (quoting In re Khalil, 379 B.R. at 173). The Roses argue that the bankruptcy court erred because Mr. Rose testified that he did not prepare the SOFA. Rather, Mr. Rose testified that the Roses relied on Kathy Robinson, Mr. Rose's long-time bookkeeper, Aliniazee, and their attorneys and accountants to gather the information needed to complete the SOFA and that he and Mrs. Rose just reviewed the documents before they were filed.[31] Mr. Rose also testified that he did not deliberately omit the Highpoint account transfers but that he did not list the transfers of the tax returns because tax returns are not income and

_____

[30] Id. at 47, ¶ 10.

[31] Defendants' Post-Trial Memorandum of Law at 6-7, Tab 2, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

because the Highpoint account was not a closed account.[32]  The Roses argue that a valid

disagreement over whether the SOFA required the listing of the account should not be used

to infer intent.  The Roses also argue that the bankruptcy court was holding Mr. Rose to a

higher standard simply because he was smart and well-educated.

The Highpoint account should have been listed on the original SOFA, and there is

evidence that suggests that Mr. Rose knowingly omitted it.  Mr. Rose testified that he read

his bankruptcy schedules and statements and certified them as true even though they did not

include any mention of the Highpoint account.[33]  Mr. Rose also testified that "he had the

Highpoint account in mind as he signed his bankruptcy papers."[34]

Finally, the Roses argue that the bankruptcy court erred in finding fraudulent intent

for purposes of section 727(a)(4)(A).  "To demonstrate fraudulent intent, [plaintiff bears] the

burden of showing that: "'(1)[Mr. Rose] made the representations [e.g., a false statement or

omission in bankruptcy schedules]; (2) ... at the time he knew they were false; [and] (3) ...

he made them with the intention and purpose of deceiving the creditors.'"  In re Retz, 606

F.3d at 1198–99 (quoting In re Khalil, 379 B.R. at 173).  "Intent is usually proven by

circumstantial evidence or by inferences drawn from the debtor's conduct."  Id. at 1199.

---

[32]Trial Transcript at 25-29 (April 28, 2016), Tab 6, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

[33]Transcript of Recorded Proceedings of the Section 341(a) meeting at 5:1-6, Tab E, Excerpts of Record in Support of Trustee's Response Brief, Docket No. 15.

[34]Findings of Fact, Conclusions of Law and Order at 14, ¶ 23, Tab 7, Excerpts of Record in Support of Appellants' Opening Brief, Docket No. 9.

"Reckless indifference or disregard for the truth may be circumstantial evidence of intent, but is not sufficient, alone, to constitute fraudulent intent." Id.

The evidence was clear that Mr. Rose was using the Highpoint account to hide his assets from Meridian pre-petition. But, there is scant evidence that by the time the Roses filed bankruptcy, Mr. Rose intended to deceive Meridian or any of his other creditors by not listing the Highpoint account on the original SOFA. The bankruptcy court erred in concluding that Mr. Rose omitted the Highpoint account on the original SOFA with the intention to deceive the Roses' creditors.

## Conclusion

Based on the foregoing, the bankruptcy court's order and judgment denying a discharge based on section 727(a)(2)(A) is affirmed but the bankruptcy court's order and judgment denying a discharge based on section 727(a)(4)(A) is reversed.

DATED at Anchorage, Alaska, this 3rd day of May, 2017.

/s/ H. Russel Holland
United States District Judge